ARMSTRONG et al. v. DE FOREST RADIO TELEPHONE & TELEGRAPH CO. *

(Circuit Court of Appeals, Second Circuit. February 8, 1926.)

No. 218.

1. **Judgment** ☞527—Decree is enforced in accord with findings of fact embodied in findings directing decree.

Decree, though given in general terms, is interpreted and enforced in accord with findings of fact embodied in findings directing decree.

2. **Judgment** ☞526—Interpretation of decree may be investigated, not requiring further evidence, but only record of opinions.

While decree, as between parties, is final, what was adjudged thereby may be investigated, not requiring further evidence, but only record of opinions.

3. **Injunction** ☞210.

Object of supplementary injunction is to specify and apply original injunction to actions and objects nonexistent when case was decided.

4. **Patents** ☞328—Rearrangement of elements to do same thing in same way as prior Armstrong patent, No. 1,113,149, is infringement.

Armstrong's patent, No. 1,113,149, for radio frequency oscillations in plate circuit of audion,

*Certiorari denied 46 S. Ct. 471, 70 L. Ed. ——.

having antedated De Forest's and Schloemilch's, even if latter can be so rearranged or adapted to do same thing in same way that Armstrong's did, such doing is an infringement on Armstrong's rights.

5. **Patents** ☞328—New production of radio receivers held to fall within final decree restraining original production as an infringement of Armstrong's patent, No. 1,113,149, and to warrant supplementary injunctive relief.

New production of radio receivers, containing one particular piece of apparatus nonexistent when final decree restraining original production as an infringement of Armstrong's patent No. 1,113,149, was rendered, held to fall within such decree as interpreted by opinions directing same, and to warrant supplementary injunctive relief.

Hand, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Application for supplementary injunction by Edwin H. Armstrong and another against the De Forest Radio Telephone & Telegraph Company. From an order granting injunction, defendant appeals. Affirmed.

This is the same litigation of which the trial in the District Court is reported in 279 F. 445, and the decree then pronounced we affirmed in 280 F. 584. By these decisions it was finally settled as between the parties to this suit that Armstrong patent, No. 1,113,-149, was valid and that its scope and interpretation were as set forth in the opinions cited.

The defendant has continued to make and sell wireless apparatus, and it has lately produced a "receiving set," known as D–17, which plaintiff considered to embody the invention defined in claims 15 and 16 of his patent. These claims are among those heretofore definitely validated in this suit and held to have been infringed by defendant.

Upon affidavits describing D–17 and pointing out how and why it infringed claims 15 and 16, plaintiff moved for a supplementary injunction, and on affidavits pro and con injunction issued, restraining defendant from making, etc., "radio receivers of the type known as De Forest D–17 * * * containing the regenerative invention of the Armstrong letters patent, No. 1,113,149." From this injunction order, defendant appealed.

Thomas G. Haight, of Jersey City, N. J., and Samuel E. Darby, Jr., of New York City, for appellant.

Stephen H. Philbin and Charles Neave, both of New York City, for appellees.

Before HOUGH, MANTON, and HAND, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The practice pursued below has been criticized at bar, but the matter has been sufficiently treated in Green v. Adams Co., 247 F. 485, 159 C. C. A. 539, and Gordon v. Turco-Halvah Co., 247 F. 487, 159 C. C. A. 541. Supplemental injunctions are sometimes useful remedies. We note Minerals, etc., v. Miami Co. (C. C. A.) 269 F. 265, and remain of opinion that at times injunction is preferable to contempt proceedings.

In a sense they are alike, for both reach only matters fairly covered by the decision already made. But in another sense injunction gives definition of whatever rights, always growing out of the original decision, plaintiff may be found to possess.

[1] But, whichever method is pursued, the basis of procedure is that the parties before the court are those whose rights have been finally adjudicated and on the merits. Yet a decree, though given in general terms, is to be interpreted and enforced in accord with the findings of fact embodied in the findings directing decree.

[2] The first thing to be done is to ascertain exactly what was decided according to the opinions filed. As between the parties, whatever was there found is final. The facts as between the parties are not open to further examination, and it is improper to turn either a contempt proceeding or an application for supplemental injunction into an inquiry whether the court was wrong, or whether some hole or omission can be discovered in its opinion. That the matter has been judged is the fundamental fact, but exactly what was adjudged is matter for investigation, not requiring further evidence, but only the record of the opinions. Otherwise there is no end to the suit, and the well-known dictum of Judge Coxe, that "even patent litigation must come to an end sometime," would be even harder to believe than it now is.

[3] It is not true that the object of a supplemental injunction is to *amplify* the original one; the object is not to amplify, but to *specify*, and apply the original injunction to actions and objects nonexistent when the case was decided. The inquiry is whether acts and things that have come into existence since decree would have been enjoined by that decree, had they then existed.

So the present inquiry is: Does the new thing, known as receiving set D–17, fall within the injunction issued in accordance with the final decree herein, as interpreted by the opinions directing the same?

The following matters have been finally settled between these parties:

[4] Armstrong was the first to divine or understand radio frequency oscillations in the plate circuit of the audion (280 F. 587), and this concept was his on January 31, 1913. Therefore his invention antedated De Forest on the same subject, and likewise Schloemilch. From this it follows that, even if Schloemilch and De Forest can be so rearranged or adapted as to do the same thing in the same way (within a proper range of equivalents) that Armstrong did, such doing is an infringement upon Armstrong's rights.

It was also held that, though Armstrong disclosed his invention only as applied to a receiver, the invention is of such a character as to apply as well to a transmitter. 280 F. 596. Also that Armstrong's patent is for an instrumentality or means, and not for a mere principle of operation. 280 F. 597. Again, that an instrumentality duly described and shown in Fig. 3 of the patent is the introduction into the plate circuit of an inductance $L'$. 280 F. 596. And this instrumentality puts into practice the underlying principle or thought of the invention, which is that "any arrangement by which oscillating current energy is transferred from the output or plate circuit of the audion to the input or grid circuit, to sustain the oscillations in the grid circuit, is included in the" inventive concept. 279 F. 448. Further, that Armstrong's patent "does not indicate any use of the audion in the oscillating condition; but, when the audion is oscillating, due to feed back, it is coincidentally regenerating." 279 F. 448.

There is nothing in the patent confining regenerative feed back to currents of either radio or audio frequency. It is admitted that oscillations of the same wave length exist in currents of both frequencies, and the object of the invention as stated in the disclosure is "to amplify the effect of the received wave upon the current in the telephone or other *receiving circuit.*" Patent, p. 1, line 19. It is merely untrue that Armstrong (as is now contended) is confined to a detector, for he plainly stated that what he improved was "any receiving circuit," and that devices for amplification of oscillations of radio frequency impressed on the grid circuit are devices for amplifying received waves in a part of a

receiving circuit is too plain to endure argument.

Further, by upholding the validity of claims 15 and 16, it was held that "means supplementing the coupling of the audion," etc., included an inductance in the plate circuit. In so holding, it was recognized that, if audions be arranged in cascade, then "accidental capacity feed back" occurs (279 F. 453); but what Armstrong did was to regulate and utilize that feed back for amplifying purposes. Accidental feed back may be a nuisance; designed and regulated feed back, utilized by the means disclosed by Armstrong is (as was held plainly) an invention of importance and merit.

Within the findings now indicated, but not fully restated, we inquire whether defendant's D–17 apparatus is or is not doing anything more than enduring or making as small a nuisance as possible of the inherent feed back of a system of audions arranged in cascade? There is no difference of opinion as to the schematic arrangement of circuits, batteries, etc., made and sold by defendant as its D–17 device.

The grid circuit of the first audion in cascade, when tuned by means of the variable condenser ("receiver tuning"), intercepts currents of radio frequencies, which are amplified and further amplified by the first, second, and third tubes. The plate circuit of the first tube contains the primary coil of a transformer for currents of radio frequency, but across the terminals of the secondary is what is called the "amplifier tuning." This condenser is physically in the grid circuit of the second tube, but inasmuch as admittedly the plate circuit may be tuned either by varying the inductance or capacity of an element directly in the circuit, or by varying the inductance or capacity of an element in a second circuit suitably associated with the first, the effect and the intended effect of this "amplifier tuning" inductance in the secondary is exactly the same as it would be, were it situated in the primary, and if it were so situated it would be identical in position, function, and operation with the inductance $L'$ of Fig. 3 of Armstrong's patent. There is a perfect equivalence.

Unless, therefore, Armstrong's patent is to be restricted to regeneration at audio frequencies, or unless the existence of unregulated, and, before Armstrong, unregulatable, feed back or regeneration in a cascade system is to prevent infringement, this is a plain case. But the fact of inherent feed back was recognized, considered, and disposed of by the original decision herein, and the patent is not and cannot be confined to audio frequencies; therefore D–17 infringes.

We think it clear that this arrangement of an inductance effectively governing the plate circuit of the first audion is for the definite purpose of assisting and increasing amplification in or by that audion. But it makes no difference what it is there for, if in point of fact it does amplify by feed back or can be utilized to amplify by that method; in either case it is an infringement.

[5] For these reasons we find that the injunction was properly granted. It serves definitely and specifically to point out for the future one particular piece of apparatus nonexistent when the case was decided, which would have infringed if it had then been in existence, and which does infringe now. The result would have been exactly the same, had contempt proceedings been taken, except for an assessment of damages.

Decree affirmed, with costs.

HAND, Circuit Judge (dissenting). There are many controversies in this case, which I agree were forever set at rest by the earlier decision. We cannot consider Schloemilch & Von Bronk's patent; we cannot consider whether Armstrong's patent was confined to a detector; possibly we should say that claim 15 covers any audion which can control the "feed back" of radio frequency energy by a variable inductance functionally within the wing circuit only. It is hard to say that about claim 16, because, if we so construe it, the words "resonant wing circuit," add nothing. But in any case claim 16 is not important here.

But, when all is admitted which should be admitted, the plaintiff must still show, in a summary proceeding like this, and beyond any reasonable doubt whatever, that the condenser in the second grid circuit will operate to tune the wing circuit, so as to produce a "controlled feed back." This is flatly denied, and I cannot see what right we have to take the issue against the defendant on affidavits. I think that the defendant can afford to admit that the condenser may be used to make the primary member of the transformer, which links the wing circuit with the second grid circuit, into a variable inductance, and that the wing circuit may thus be tuned. Indeed, I do not understand that the defendant denies this.

But its experts do say that the first audion, even when taken with the condenser of the second grid circuit, will not "control" the "feed back." Weagant gives the rea-

sons; he says that "in tune" means one thing when applied to resonance to the frequency of the incoming waves, and another when applied to "feed back"; that is to say, the second grid circuit may be tuned to those waves, and perhaps coincidently and necessarily the wing circuit with it, though as to that I am not clear, but in any case this "tuning" is not the same as that necessary to any regeneration which is practically distinguishable from the mischievous "inherent" feed back acknowledged to be present in all amplifiers. Thus Weagant says that, as the critical point of these tunings is different, you cannot at once tune the wing circuit to the frequency of the received waves and accomplish "controlled feed back." That, of course, is a subject on which we can have no independent opinion; it seems to me to stand in this record as a stark contradiction.

Perhaps the defendant has put its condenser in the second grid circuit mala fide. Even if what it says is true, it may be possible and better to tune the wing circuit to regenerate, leaving the second grid circuit off tune. That is perhaps made probable by the fact that the third and fourth grid circuits are not tuned at all. But it does not seem to me safe to go on such speculation. I do not know whether when the second grid is left off tune, if it is, that may not result in a worse condition, even though the wing circuit will then control the "feed back," than if the second grid circuit were tuned to the received waves, and perhaps the wing circuit with it, and the wing circuit were off tune to regenerate.

I should not say that it was an infringement to make and sell the audion, if, in order for it to regenerate, the whole apparatus had to be distorted from its practical optimum. Armstrong's patent could not mean to cover a device which structurally was capable of regenerating only at the expense of its efficiency. I do not suppose that that is asserted. So far as I can see, it must be asserted, or the issue of fact must be taken against the defendant.

In conclusion, while I do not want to throw the least question upon the propriety of a summary proceeding when we are dealing with a simple machine, or a design, or an easily understood process, I confess it does seem to me unfair to the defendant to adopt it in a case as complicated as any involving wireless telegraphy or telephony. We are all very keenly aware of the difficulties of putting into tangible sensuous equivalents the terminology of such an art, and yet, till we

can do so, I do not see how we can proceed safely; at least, I know that I cannot. I admit that it is difficult enough after a trial with cross-examination. Even then I am never confident that I am using the terms in a way that makes sense to an expert. But at least we should have the advantage of whatever light we can get, especially of subjecting the statements of experts to cross-examination. We may not merely choose to say that the defendant's account of what takes place is false, and that the plaintiff's account is true. After a good deal of study, I have been unable to see how we can affirm this order without taking that position.