The W. E. BASSETT COMPANY, Plaintiff,

v.

The H. C. COOK COMPANY et al., Defendants.

Civ. No. 6532.

United States District Court
D. Connecticut,
Civil Division.

July 15, 1958.

As Amended Sept. 9, 1958.

---

See, also, 156 F.Supp. 209.

Samuel A. Persky, Stoddard, Persky, Eagan & Cobey, New Haven, Conn., for plaintiff.

Lindsey & Prutzman, Hartford, Conn., William K. Bennett, Ansonia, Conn., of counsel, for defendants.

ANDERSON, District Judge.

This motion seeks a judgment or order to supplement or enforce the preliminary injunction issued July 23, 1957, restraining the defendants, Cook, Lighter Corporation and Ernest C. Britton, from certain specified acts of unfair competition in the production and distribution of a novelty pocketknife which the plaintiff put on the market about May of 1956. Since the acts of unfair competition were sufficiently related to the alleged infringement of United States Patent No. 2,779,098, issued to the plaintiff relative to a spring action in its knife, on January 29, 1957, the cause was properly before the court by virtue of its pendent jurisdiction. 28 U.S.C. § 1338; Maternally Yours v. Your Maternity Shop, 2 Cir., 1956, 234 F.2d 538.

The temporary injunction was based on findings that the defendants' had simulated the plaintiff's patented spring detent devise in an imitative knife, that the defendants had palmed off the imitative knife on dealers or others as a product associated with the plaintiff, and that the defendants' trade names "Slim Jim" and "Mr. Slim" were confusingly similar to plaintiff's "Trim Trio" in sound and meaning.

After the temporary injunction issued, the defendants produced a new knife, Exhibit 22, and sought a clarification of the injunction in relation to the new item. In a memorandum of decision dated September 30, 1957, this court refused to modify the temporary injunction, since the defendants were, in effect, seeking an advisory opinion. The plaintiff presently moves for either a supplemental injunction or a civil contempt citation to restrain the production and distribution of another new knife, Exhibits FA and FD, currently being sold by the defendant, Lighter Corporation. On the pending motion the following findings, based on the moving affidavits,. depositions and testimony given at the hearing, are made:

1. The novelty pocketknife trade is divided into two distinct markets. In one—the advertising specialty trade—the sale is made through a jobber to a customer, who gives the knife, imprinted with the customer's name for advertising purposes, to the ultimate user. In the other—the carded goods trade—the sale is made through a jobber and a retailer to the customer, who is the ultimate user of the knife.

2. By custom of the trade in the advertising specialty field, maker identification on the knife or its package is avoided. The jobber is aware, of course, of the manufacturer but conceals this information to prevent the customer from purchasing directly from the manufacturer.

3. The defendants began manufacturing the knife, Exhibits FA and FD, which is at issue here, about three months after the temporary injunction issued. This knife was first produced for the advertising specialty trade and several months later, in early 1958, production began for the carded goods trade.

4. The new knife which is produced for the carded goods trade, Exhibit FA, unlike the enjoined knife, is imprinted along its back edge with the words, "Lighter Corp. Newington. Ct. U.S.A." and is retailed from counter display cards marked "Buddy Boy knife and opener" and "Manufactured by: Lighter Corp., Newington, Conn."

5. The new knife produced for the carded goods trade, Exhibit FA, is identical to the new knife produced for the advertising specialty trade, Exhibit FD, except that the former is imprinted with defendant Lighter Corporation's name along its back edge.

6. The knife which the court refused to pass upon in its September 30, 1957, decision, Exhibit 22, has been produced for one advertising specialty order from the Carolina Life Insurance Co. and for two other customers.

7. The knife at issue here, Exhibits FA and FD, is approximately the same over all length and height as the previously enjoined knife. It is shaped in the form of a rhomboid whereas the enjoined knife was shaped as a trapezoid with rounded edges at the open corners of the case. It further differs in that there is no separate hole for the key chain, which is inserted through the eyelet securing the blades to the casing, and there are only two blade elements—a knife and a bottle opener—and thus Exhibits FA and FD are thinner than the enjoined three-blade model.

8. The new knife in general production, Exhibits FA and FD, has a small indentation on the back edge, which covers an area approximately one-third as large as the simulated integral spring detent feature on the enjoined knife. If the indentation and the simulated feature were transposed to the same knife-case, the areas covered would not coincide, but would be adjacent to each other.

9. The defendants' purpose for the indentation on the new knife is to prevent the knife-blade from being closed beyond the reach of the fingernail groove with which the blade is opened. The cut-away model of the new knife, Exhibit 15, shows that the base of the knife-blade rests on the indentation.

10. The Dunrite Service was hired by the plaintiff to conduct surveys in the trade to see to what extent advertising specialty jobbers and retailers could identify the manufacturer of defendants' new knife. Mr. Charles F. Perner, a private investigator and owner of the Dunrite Company, on oral instructions from the plaintiff's counsel, conducted the surveys and submitted six reports which, with the testimony in Mr. Perner's deposition, indicate:

(a) 7 advertising specialty jobbers and 30 retailers were interviewed. (44 calls were made but 7 were not available for interview.)

(b) The names of all of the jobbers and 9 of the 30 retailers were taken from lists furnished by the plaintiff. 21 of the retailers were selected at random in an area from 42nd Street to 30th Street near Third Avenue in New York City, a territory selected on advice of plaintiff's counsel.

(c) Of the 37 jobbers and retailers asked if they could identify the manufacturer of the defendants' new knife, 24 could make no identification, 6 identified the defendants' knife as being manufactured by the plaintiff; 3 were doubtful, i. e. they thought it might be made by plaintiff; 2 correctly recognized it as being made by the defendants; and 1 did not know who manufactured the knife, but knew it was not the plaintiff's.

(d) Of the 6 retailers who identified the knife as being produced by the plaintiff, the names of 5 were on the lists furnished by the plaintiff.

(e) The knife was displayed so that the back edge where the defendant's name is imprinted was not visible to the person being interviewed and was shown detached from the tent-like card upon which it is sold in the retail trade.

11. The National Business Gifts Co., a jobber in the advertising trade, noting that the new knife was similar to plaintiff's knife but different in that it had only two blades, inquired by letter to the plaintiff as to the cost of the defendants' new knife, and stated, "We did not find this [the unimprinted new knife] in your catalogue but are sure you make it." (Exhibit FB.)

12. The Trixie Co., in returning 93 pocketknives to the plaintiff for credit, included two new knives imprinted with the defendant Lighter Corporation's name, Exhibit FA. (Exh. EZ.)

13. The Henry Souther Engineering Co., on the request of the defendant Lighter Corporation, conducted compara-

tive tests on the knives manufactured by the plaintiff and those made by the defendants and concluded that "both knives would be considered satisfactory for the functional purposes for which they are intended," and found only small variations in quality.

14. In addition to advertising specialty jobbers and retailers, the plaintiff occasionally sells its knives to certain customers who incorporate the knife in kits or cases which are in turn sold as a unit under the name of the customer who assembled the units.

15. The indentation on the back edge of the new knife, Exhibits FA and FD, is similar in appearance to the detent action feature, which is the subject of two new Bassett patents, U. S. Letters Patent No. 2,798,290 and No. 2,814,106, which are different from the patent which was the basis of this court's pendent jurisdiction. No. 2,798,290 was issued July 9, 1957; and No. 2,814,106, a revision of the former, issued November 26, 1957. Although notices of the issuance of these patents appeared in the newspaper in the town in which defendants' plant is located, descriptions of the patents were not publicized. The plaintiff had never sold or manufactured any knives under these patents, and has made no present claim of infringement of these patents.

## Conclusions of Law

1. This Court has jurisdiction of the subject matter and of the parties in this action.

2. The plaintiff's knife has not acquired a secondary meaning.

3. There are no grounds for a supplemental temporary injunction, nor are the defendants found in contempt.

## Discussion

In its present motion, the plaintiff seeks: (1) a supplemental injunction extending the preliminary injunction dated July 23, 1957; or (2) a citation of the defendants for contempt of court for failure to obey the initial injunction, which is derived from the prayer in the motion "for such other and further relief as to the Court may seem just". United States v. United Mine Workers, 330 U.S. 258, 300, 67 S.Ct. 677, 91 L.Ed. 884. Both of these claims for relief are aimed at preventing the defendants from producing and distributing their new pocketknife, designed, manufactured and sold since July 23, 1957. (Exhibits FA. and FD.)

■ The basic principle underlying the law of unfair competition—in the context of this case—is that the goods of one manufacturer shall not be sold for those of another. Although the precise rules to be applied in determining whether an initial producer has exclusive property rights to the general appearance of his products are complex, the courts are in accord on this basic principle. Howe Scale Co. of 1886 v. Wyckoff, Seamans & Benedict, 198 U.S. 118, 25 S.Ct. 609, 49 L.Ed. 972; Lewis v. Vendome Bags, 2 Cir., 108 F.2d 16.

■ In the absence of any actual palming off—which this court found as the basis for the initial injunction but which is not present on the pending motion—the plaintiff has a twofold burden. It must show (a) a specific type of source association which has become known to the law as secondary meaning, and (b) a risk that customers are likely to be confused by purchasing defendants' knife when they intend to purchase the plaintiff's products. General Time Instruments Corp. v. United States Time Corp., 2 Cir., 165 F.2d 853. Although the plaintiff contends that on the evidence produced, its product has acquired a secondary meaning, it also claims, as an alternative argument, that such a showing is not necessary. On the later point, the plaintiff's position is rejected as a matter of law. In the context of the first injunction, where the evidence showed that the defendants used the plaintiff's knife to solicit orders for their own knife and that the defendants directed their jobbers to make use of the plaintiff's advertising, there was palming off even in the absence of a finding of secondary meaning. Several of the findings on the initial injunction relate to source association,

which was present in some instances, but not to a sufficient extent or degree to constitute a secondary meaning and the court particularly made no finding of secondary meaning, and rejected the plaintiff's draft finding of secondary meaning. The palming off which the court found on the initial injunction is a type of actual palming off which is described in the Restatement as fraudulent marketing. Section 712, Restatement, Torts. On the pending motion there is not only no evidence of the type of actual deception found on the initial injunction, but the defendants marketing techniques appear to be designed to avoid allegations of actual palming off. The defendants have now taken steps to make certain that their own knife is used as a soliciting sample (Exhibit AP) and notice their knife as "Really Different" (Exhibit DM). There is no evidence that the defendants any longer urge their jobbers to take advantage of the plaintiff's advertising. Absent such actual deception, there must be a showing of the peculiar type of source association known as secondary meaning. Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co., 7 Cir., 133 F.2d 266, 270.

Secondary meaning—which had its origin in the law of descriptive titles where the primary or common meaning v. the secondary or specialized meaning dichotomy was more apparent—is an elusive idea. But it is clear from the court's opinion by Judge Learned Hand in the Crescent Tool case, a leading decision, that a finding of secondary meaning is a necessity in the type of case where similar goods are involved.

"The cases of so-called 'nonfunctional' unfair competition, starting with the 'coffee mill case," Enterprise Mfg. Co. v. Landers, Frary & Clark [2 Cir.], 131 F. 240, 65 C.C.A. 587, are only instances of the doctrine of 'secondary' meaning. All of them presuppose that the appearance of the article, like its descriptive title in true cases of 'secondary' meaning, has become associated in the public mind with the first comer as manufacturer or source, and, if a second comer imitates the article exactly, that the public will believe his goods have come from the first, and will buy, in part, at least, because of that deception. Therefore it is apparent that it is an absolute condition to any relief whatever that the plaintiff in such cases show that the appearance of his wares has in fact come to mean that some particular person—the plaintiff may not be individually known—makes them, and that the public cares who does make them, and not merely for their appearance and structure. It will not be enough only to show how pleasing they are, because all the features of beauty or utility which commend them to the public are by hypothesis already in the public domain. The defendant has as much right to copy the 'nonfunctional' features of the article as any others, so long as they have not become associated with the plaintiff as manufacturer or source. The critical question of fact at the outset always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source. Unless the plaintiff can answer this question he can take no step forward; no degree of imitation of details is actionable in its absence." Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 247 F. 299, 300.

To establish such secondary meaning, then, the plaintiff must show: (1) that the appearance of the product is a mark of distinction identifying its source; and (2) that purchasers are moved, at least in part, to buy the knife because of its source. Furthermore, the secondary meaning must have been established when the defendants entered the field. Lucien Lelong, Inc., v. Lander Co., 2 Cir., 164 F.2d 395, 397.

To meet its burden on both the secondary meaning and customer confusion issues, the plaintiff relies on two letters

from jobbers, the surveys conducted by the Dunrite Co., and the findings of this court on the initial injunction, the later of which it characterized as the law of the case. The plaintiff contends in its brief that the court's previous finding of fact, No. 3,—the "knives have become associated with plaintiff as well as with said products"—is "ample proof of the source significance of plaintiff's design." But as noted above, neither Finding No. 3 nor Finding No. 8, which the plaintiff might have mentioned, were meant to establish that peculiar type of source significance known as secondary meaning as that term has been repeatedly interpreted by the Court of Appeals in such cases as Lucien Lelong, Inc., v. Lander Co., supra. Nor, as the analysis below shows, do the letters from the jobbers and the surveys furnish the additional proof necessary for the plaintiff to sustain its two-fold burden.

Since the law of unfair competition requires that the needed secondary meaning connotation be acquired in the ultimate customers' market, Nims, Unfair Competition and Trade Marks, 4th Ed., Sec. 331, it is necessary to analyze the plaintiff's proofs from the two different components of the novelty knife trade. The ultimate customer, in the advertising specialty trade, purchases the knife in quantities as give-away items, while the ultimate customer in the carded goods or retail trade is the ultimate user. In the advertising trade, maker identification is withheld from the customer; otherwise, the quantity he purchases might allow the advertising customer to shortcut the jobber by dealing directly with the manufacturer.

To meet the obviously heavy burden of showing secondary meaning in a market which by trade custom conceals the manufacturer's name, the plaintiff can rely on only the National Business Gifts Co. correspondence, the Trixie Co. correspondence, and on the surveys which relate to the carded goods or retail trade. In the course of the correspondence National wrote the plaintiff, "We did not find this [the Defendants' knife] in the catalogue but are sure you make it." Although the National letter is admissible over the defendants' hearsay objections for it is not offered to establish the truth of its assertions, S. C. Johnson & Son v. Johnson, D.C., 28 F.Supp. 744, 749, it clearly does not meet the burden required by the Lander case, supra. As a letter from a jobber it is relevant, but it is only indirectly evidence of customer confusion. Parfumerie Roger & Gallet v. M. C. M. Co., 2 Cir., 24 F.2d 698, 699. Evidence of confusion under some circumstances may form the basis for an inference of the presence of secondary meaning, Nims, Unfair Competition and Trade Marks, 4th Ed., Sec. 331, but in the context of the advertising specialty trade, where the source is intentionally concealed, National's comment that "We are sure you make it" falls well short of establishing either that the appearance of the product identifies the source or that the purchasers are at all moved to buy the knife because of its source. There being no showing of secondary meaning in the advertising specialty trade, there is no need to consider other evidence of customer confusion, for the plaintiff, as noted, cannot prevail without a showing of secondary meaning. Algren Watch Findings Co. v. Kalinsky, 2 Cir., 197 F.2d 69, 72; General Time Instruments Corp. v. United States Time Corp. supra, 165 F.2d at pages 854–855; Lucien Lelong, Inc., v. Lander Co., supra, 164 F.2d at page 396.

In the retail trade, the new evidence which the plaintiff supplies is the Dunrite Service Poll and the Trixie Co.'s inclusion of two of the defendants' knives with ninty-one of the plaintiff's knives returned for credit. Here again, both items are admissible despite the defendants' hearsay objections. 6 Wigmore, Evidence, 3d Ed., Section 1776. And as showing jobber and retailer confusion they tend to establish customer confusion, Parfumerie Roger & Gallet v. M. C. M. Co., supra, 24 F.2d at page 699, which in turn is relevant to the secondary meaning required. Although relevant, The Trixie Co. action and the poll

are of little weight. Both tend to show confusion which is only indirectly related to the necessary showing of secondary meaning in customer market. Overlooking the somewhat unscientific selective techniques, see Note, 66 Harvard Law Review 498, the poll shows that six retailers identified the defendants' knife as the plaintiff's product. But the interviewer displayed the knife so that defendants' name on the knife and card from which it is usually sold were not visible. However, when the ultimate customer purchases from the retailer the name of the Lighter Corporation will be visible on the knife and the card, which, it should be noted, also now carries a new tradename, "Buddy Boy". This identification tends to insulate any retailer confusion from carrying over to the retailers' customers. Here again, these two items of proof do not show the needed type of source association and that the public is moved in any degree to buy the knife because of its source. The poll and the communications from jobbers obviously relate to market conditions after the defendants' knives came on the market, for they purport to show confusion between the two products, and thereby give the plaintiff's product a secondary meaning. But secondary meaning, under the Lander case, must be established as of the time of the defendants entry into the market. This dilutes the strength of the new evidence, as does other new evidence that plaintiff's knife was sold to kit manufacturers who sold and distributed it, under their own names, as a unit. The latter would tend to detract from any public recognition of the product as emanating "if not * * by name, at least from a single, though anonymous, maker", Shredded Wheat Co. v. Humphrey Cornell Co., 2 Cir., 250 F. 960, 963. The limited evidence of trade confusion—particularly in the absence of any direct evidence that the main significance of the plaintiff's knife in its marketing dress is the significance of product and producer, and in view of the fact that the plaintiff's knife had been marketed less than six months when the defendants put on the market the enjoined knife and less than a year and a half when the defendants began making and selling its new knife—is insufficient to show secondary meaning. The plaintiff has not sustained its burden of proving that an appreciable number of ordinarily prudent purchasers are confused as to the source of origin of the goods or are likely to be so confused.

Therefore, in neither trade is the proof sufficient to show the ultimate purchasing power has affixed the necessary secondary meaning to the plaintiff's product. Consequently, the plaintiff must fail in its request for a further injunction. Algren Watch Findings Co. v. Kalinsky, supra; General Time Instruments Corp. v. United States Time Corp., supra; Lucien Lelong, Inc., v. Lander Co., supra.

The plaintiff also argues that the simulation of a patented feature, independent of secondary meaning, is actionable unfair competition. The plaintiff's reliance on Ely-Norris Safe Co. v. Mosler Safe Co., 2 Cir., 7 F.2d 603, 604, for this proposition is misplaced. Mosler, aside from the fact that the case was reversed by the Supreme Court, 1927, 273 U.S. 132, 47 S.Ct. 314, 71 L.Ed. 578, and that the plaintiff lost on re-trial, 2 Cir., 62 F.2d 524, is not applicable unless there is a showing that the defendants represented the indentation, previously described, as the patented device. In Mosler, the defendant made safes without an explosion chamber, but put a metal band around the door at a place where the plaintiff's safe had a patented safety chamber and the defendant falsely told its customers that its band was employed to cover and close an explosion chamber. In the case at bar, there is no evidence that the defendants made any representation that the indentation on the new knife was the integral spring detent feature on which the plaintiff has a patent. The Mosler doctrine, although perhaps available to support the action on the initial injunction, is no basis for further injunctive relief.

Due regard for the principles of a free and competitive economy requires that

the defendants have a right to the benefit of the public's desire for a product even if the desire for the product was created by the plaintiff. As Justice Holmes noted while on the Supreme Judicial Court of Massachusetts, "The only thing it [the defendant] has *not* the right to steal is the good will attaching to the plaintiff's personality, *the benefit of the public's desire to have goods made by the plaintiff.*" Flagg Mfg. Co. v. Holway, 178 Mass. 83, 59 N.E. 667, (Emphasis added.)

The initial injunction restrained the defendants from "imitating or copying the identifying non-functional features and forms of plaintiff's said knife" in addition to enjoining the defendants from palming off and falsely claiming ownership or rights under a patent issued to the plaintiff. There being no claim that the defendants have made false claims nor engaged in actual palming off since the injunction, only the "imitating or copying" element of the injunction is brought into focus on the plaintiff's claim for contempt relief.

█ For the purpose of determining the presence of a contempt, this court uses the same measure as it uses in deciding whether or not a supplemental temporary injunction should issue, and that is whether the defendants' new knife would have been enjoined by the court in July, 1957, if it had been before the court at that time. Armstrong v. De Forest Radio Tel. & Tel. Co., 2 Cir., 10 F.2d 727.

The plaintiff, citing various sections of Nims' treatise, argues that one found guilty of unfair competition must do more than show how close he can with safety come to the appearance of the enjoined item. Most of the authorities cited by Nims are either trade-mark cases or cases in state jurisdictions not concerned with this litigation. Reliance on Rymer v. Anchor Stove & Range Co.,

6 Cir., 70 F.2d 386, 389, is misplaced. This is the one general appearance case cited by the plaintiff. In that case the plaintiff altered its initial product, which had acquired a secondary meaning, in order to avoid the unfair competition which resulted when the defendant imitated the first product. The plaintiff's second product had as yet acquired no secondary meaning. The Sixth Circuit sustained an injunction compelling a specific indication of the origin of the defendant's imitating product. The display of the defendant manufacturer's name, which was ordered, was no greater than what that defendant had already undertaken to provide. This, of course, does not sustain the plaintiff's position in the case at bar, where a different issue is at stake. Furthermore, within the areas cited in Nims, it is clear that the learned writer considers that the same standard applies in contempt cases as governs the issuance of a supplemental injunction:

"When decrees in trade-mark infringement and unfair competition cases are interpreted in contempt proceedings, the rules applied are substantially those which govern the issuance of decrees." 2 Nims, Unfair Competition and Trade-Marks, page 1188.

"It is not contempt of court to continue to use a name or other trade symbol which was in use at the time that an injunction was granted, but was not enjoined." 2 Nims, Unfair Competition and Trade-Marks, page 1191.

From the foregoing discussion it is apparent that the defendants' new knife would not have been enjoined had it been before the court at the July, 1957, hearing. The plaintiff has failed to prove that there is a basis for either a supplemental injunction or a citation for contempt.

The motion is denied.