## In re MAINE STATE RACEWAYS.
### No. 23467.

United States District Court
D. Maine, S. D.
June 19, 1952.

C. Keefe Hurley, Boston, Mass., Michael Pilot, Bangor, Me., James A. Connellan, Portland, Me., for Joseph Cianchette.

Joseph B. Campbell, Augusta, Me., for Depositors Trust Co.

Mayo S. Levenson, Wilfred A. Hay, Portland, Me., for Scarborough Downs, Inc.

Edmund P. Mahoney, Barnett I. Shur, Portland, Me., for trustees.

CLIFFORD, District Judge.

This action comes before this Court on the motion of the intervenors, Joseph R. Cianchette and the Depositors Trust Company, to vacate so much of the order of the Court as authorizes the trustees, appointed pursuant to Chapter X, sec. 156, of the Bankruptcy Act, 11 U.S.C.A. § 556, to take possession of the property covered by the intervenors' mortgage, and the order approving the lease executed by the trustees to Scarborough Downs, Inc., a Maine corporation.

Maine State Raceways (hereinafter called debtor) is a Maine corporation engaged in operating several race tracks in the State of Maine. One of its tracks, called Scarborough Downs, was built for the purpose of conducting running or flat races, and is the principal asset of the debtor. The other assets of the debtor consist of three race tracks located at Gorham, Lewiston, and Old Orchard, and are primarily used for the operation of harness or sulky races.

Following the first year of operation, the various properties of the debtor were in possession of mortgagees, who have been operating the tracks in direct competition with each other.

A brief history of the proceedings to date, so far as it sheds light upon the present motion, is as follows: These proceedings were instituted on September 20, 1951, by the filing by the debtor of a petition for reorganization under the provisions of Chapter X of the Bankruptcy Act. Originally, the matter was referred to Charles A. Pomeroy, Referee in Bankruptcy for the Southern Division of Maine, as Special Master, to hear and report generally upon the issues. After a short hearing, he became seriously ill and the matter was rereferred to William Hession, Referee in Bankruptcy for the District of Massachusetts, as Special Master.

On March 19, 1952, the Special Master, submitted his report to the Court recommending that the petition for reorganization be approved and that this Court enter its findings that the petition complied with the requirements of Chapter X. This report was not then made public nor was there any formal action taken until March 31, 1952.

On March 20, 1952, however, at a conference called by the Court, with all interested parties in attendance, it was announced that the petition for reorganization would be approved and that the trustees appointed would take possession of all the tracks, as an entity, but would not be empowered to operate any of these tracks. The primary purpose of the conference was to discuss the various problems arising out of the approval of the petition for reorganization, and in particular the temporary operation of Scarborough Downs. This will be discussed later in the opinion.

On March 31, 1952, the Court accepted the report of the Special Master and appointed Franklin G. Hinckley, an attorney of Portland, Maine, and Cornelius J. Russell, a businessman of Bangor, Maine, as trustees, as the Court indicated at the March 20th conference. No objection by any party was made to these appointments at that time.

Two orders were presented to the Court for its approval in open Court on March 31, 1952.

A summary of each proposed order is as follows:

(1) The order presented on behalf of Scarborough Downs, Inc.:

The basis provisions, excluding usual administrative provisions and technical matters with reference to hearings and notices, are summarized as follows: The two appointed trustees, Franklin G. Hinckley of Portland, Maine, and Cornelius J. Russell of Bangor, Maine, be authorized to take possession of all the property of the debtor; that, along with other specified powers, the trustees have authority to enter into lease agreements of all or any part of the debtor's property; that all monies received be applied as directed by order of Court, except that for certain specified purchases (such as expense of printing, mailing and publishing notices) the trustees use their discretion, unless otherwise directed; that on or before June 2, 1952, the trustees prepare and file a plan of reorganization or a report of their reasons why a plan could not be effected; and, that all mortgages, liens, and the claims of all others asserting rights against the debtor be stayed.

(2) The second order, presented by other petitioners for reorganization and which was not accepted by the Court, differs essentially from the accepted order in that (1) the mortgagees of Scarborough, Gorham, and Lewiston tracks were to remain in possession; (2) the actual operation of the tracks was to be vested exclusively in a committee of three, consisting of Sidney Goldfine, Joseph R. Cianchette, and John J. Bourisk, which committee would be required to act unanimously in all matters; (3) that the disbursement of any surplus from operation was to be made in the following manner:

(i) First $30,000 on account of indebtedness of the debtor to Scarborough Holding Company, Inc.;

(ii) Next $50,000 to be retained for the operation of the tracks in 1953;

(iii) Balance on account of indebtedness of the debtor to Scarborough Holding Company, Inc. The plan provided that the disbursement of surplus as indicated in (3) above apply only in the event that there be no consummation of a plan, and that the petition not be dismissed. The plan further provided for a different method disbursement of surplus in the event that a plan of reorganization be effected, or in the event of dismissal of the petition; (4) that $50,000 was to be borrowed, $32,500 of which was to be earmarked for pre-opening and operating expenses of Scarborough Downs; (5) loan was to be secured by mortgage subject to mortgages held by Scarborough Holding Company, Inc., Joseph R. Cianchette, and John J. Bourisk, and subject to all valid liens and encumbrances senior to said mortgages; (6) that in consideration of the loan for $50,000 there be issued new capital stock in number equal to the number of shares of the common stock of the debtor which has been validly issued and outstanding as of March 29, 1952; (7) and that the trustees be authorized to issue trustees' certificates in the amount of $5,000.

In open Court, however, counsel for Scarborough Holding Company, Inc., objected to the issuance of trustees' certificates in any amount.

This Court indicated, that time being of the essence, a prompt decision would be rendered, and on the following day, April 1, 1952, the order presented on behalf of Scarborough Downs, Inc., was accepted and approved.

On the same day, in accordance with their authority, the trustees leased the property of the debtor to Scarborough Downs, Inc. Reference is made to plaintiff's exhibit No. 2 for full particulars of the lease.

Upon questions being subsequently raised by Scarborough Holding Company, Inc., with respect to details of the lease, the lessee assured the trustees and Scarborough Holding Company, Inc., that the lease would be modified to include in substance the following provisions: Prepayment of insurance premiums on the track at Scarborough Downs by the lessee for the year 1952, in an amount of not less than $450,000; payment of all state, county, and town real estate and personal property taxes assessed upon said track for the year 1952; that the lessee would close Scarborough Downs at the end of the 1952 racing season, and place the premises in condition to withstand the ravages of the coming winter; that the lessee would pay all bills, such as horsemen's purses, Parimutuel machines, and bond fees incurred in connection with the operation of the track during the 1952 season which, even though not encumbrances on said premises, would make impossible the operation of the track in future years.

On April 3, 1952, Joseph R. Cianchette, allegedly a holder of a mortgage executed by the debtor and covering certain property located in Gorham, Maine; John Bourisk, allegedly a holder of a mortgage executed by the debtor and covering certain property located in Lewiston, Maine; and the Scarborough Holding Company, Inc., a Maine corporation, allegedly a holder by assignment of two mortgages executed by the debtor and covering certain property known as Scarborough Downs, petitioned individually to intervene in these proceedings. The petitions were granted by this Court on April 4, 1952.

The above-named intervenors had also filed on April 3, 1952, identical motions requesting the Court (1) that a hearing be granted on the order of the Court authorizing the trustees to take possession of the property covered by the intervenors' mortgages, and of the order approving the lease executed by the trustees; (2) that the order referred to in (1) be vacated; (3) that in the alternative the Court order any further action by the trustees or by the lessee under said lease with respect to the said mortgaged property be stayed pending the disposition of any appeal filed by the intervenors; or in the alternative that an order be issued staying further action until the intervenors had reasonable opportunity to apply for a stay in the United States Court of Appeals; (4) that

624

the said lessee be ordered to file a bond with sufficient security whereby it would be required to account to the intervenors for the earnings and profits of and for the use of said property in the event it was held that the said lease was void.

A hearing on the motions of the intervenors was set for and had on April 11, 1952 at 10:00 A.M.

Before the hearing, a motion was filed by Mr. John Bourisk, one of the three intervenors, personally, for leave to withdraw his petition to intervene, and also his motion of April 3rd. This motion was granted on April 9, 1952.

In open Court, shortly before the start of the hearing on April 11, 1952, Scarborough Holding Company, Inc., a second of the three intervenors, presented a motion to withdraw its motion of April 3rd, which motion was granted immediately.

Due to a question raised at the outset of the hearing by counsel for Scarborough Downs, Inc., as to the capacity of the third intervenor, Joseph R. Cianchette, to prosecute his motion, Depositors Trust Company of Augusta, Maine, petitioned to be joined in the proceedings on the basis that it is the holder of a mortgage, in the amount of $150,000, covering certain property located in Gorham, Maine, executed by the debtor in favor of Joseph R. Cianchette and assigned by Mr. Cianchette to it. The petition was granted and the Depositors Trust Company was joined with Mr. Cianchette in prosecuting the motion presently before this Court.

The ultimate issue is whether or not there was an abuse of discretion on the part of the Court in its approving the lease of the debtor's property, executed by the trustees to Scarborough Downs, Inc.

The intervenors contend that the order entered on April 1, 1952, approving the petition for reorganization and authorizing the trustees to take possession of the property subject to the intervenors' mortgage and further authorizing them to lease all of the property of the debtor was executed without adequate or proper notice to the interested parties; that the lease, entered into on April 1, 1952, was executed without adequate or proper notice to the interested parties; that the Court abused its discretion in approving the lease because the provisions of the lease were a violation of the rights of the intervenors, the other mortgagees, the debtor, and other parties interested therein; that insufficient consideration was given to the matter by the trustees before the lease arrangement was entered into and approved by the Court; that a careful investigation by the trustees would have revealed that the lessee was an improper party; the consideration for the lease was inadequate, and the lessee was fiancially unstable; and that the principal beneficiary of the lease was Scarborough Downs, Inc., alleged by intervenor to be a creditor of the debtor.

Scarborough Downs, Inc., denies the contentions of the intervenors and asserts that there was adequate and proper notice in every respect; that the lease executed to it by the trustees was not in violation of the rights of the intervenors, the other mortgagees, the debtor, and other interested parties, and that the Court did not abuse its discretion in approving the lease.

These proceedings have been, from the very beginning, bitterly contested. And the unique and complex difficulties were compounded when the Court decided to approve the petition for reorganization. It is therefore essential to the understanding of the trustees' course of action that the general situation confronting them upon their appointment be set forth.

The principal asset of the debtor, costing in excess of $1,500,000, is the track known as Scarborough Downs, and is used primarily for flat or running horse racing. Unless the plant be operated, considerable value, if not all the value would be immediately lost, and there would be no prospect of reorganization.

To ensure its operation for the 1952 season, preparation had to be made long in advance of the opening date. Specifically, as counsel for the debtor had emphasized at a conference, and all parties agreed with him, March 20th was just about the last day on which to begin making arrangements and commitments for the opening of the Scarborough plant.

Therefore, the exigencies of the occasion required the trustees to do immediately whatever was necessary in their judgment to conserve the assets of the debtor.

Due to the hazardous and speculative factors involved in the operations of a relatively new and unique venture such as this race track, this Court deemed it unwise to permit the trustees to operate these race tracks under any circumstances. Also the debtor had no working capital, nor would the Court authorize the issuance of trustees' certificates in any substantial amount. Therefore, some sort of a temporary arrangement had to be immediately devised for the operation of the track, and, in the meantime, afford the parties an opportunity to cooperate and coordinate their efforts to the end that a workable plan of reorganization might be effected. Responsible parties had to be found with experience, for the time being, who would pay for the insurance, taxes, repairs, care for the property as it should be cared for, undertake the financial risks of operation, and defray expenses in connection with the administration of the trust. It was estimated that the minimum amount necessary for such operation would be well over $125,000.

The trustees were necessarily restricted as to the parties with whom they could negotiate for the operation of the tracks because of the prevailing fear that gambling interests might attain control. As a practical matter, the choice was limited to either Scarborough Downs, Inc., which had operated Scarborough the year before, or the group represented by Mr. Cianchette and Mr. Bourisk, or a combination of the two.

The bitter friction between these two groups, however, has been and still is intense, and the possibility of any mutual agreement is remote. The Cianchette-Bourisk group accused the persons connected with Scarborough Downs, Inc., of a scheme to burden the debtor with liabilities so that it would become a bankrupt, whereby the mortgagee in possession, Mr. Robert Verrier, Mr. Mayo Levenson, and Mr. Thomas Mourkas could take the track over and run it as their own. In further-

ing this alleged scheme, it is claimed that Mr. Verrier created dissension among the directors of Maine State Raceways. After the completion of the first racing season, Mr. Verrier and Mr. Levenson allegedly deceived the board of directors by assuring them that money would be forthcoming with which to operate the track for the next season (1951), while at the same time, the accused parties were negotiating with the mortgagee in possession, out of which negotiation resulted the formation of Scarborough Holding Company, Inc., which became the mortgagee in possession, and which in turn leased the Scarborough plant, to Scarborough Downs, Inc., with an option to purchase.

Conversely, the persons connected with Scarborough Downs, Inc., accuse the Cianchette-Bourisk group as being the primary sponsors of the legislation which resulted in banning night racing which, they assert, was the very life blood of Scarborough Downs; that Mr. Cianchette ran his track in direct competition with Scarborough Downs even though he lost $40,000 or more in doing so; and preferred other serious charges against the Cianchette-Bourisk combination.

To add to the complications, persons within the two main groups have shifted sides on occasion, to the extent that the Court did not know, and even the attorneys representing these persons did not know from day to day what position their clients would take on the morrow. And those that have not shifted sides have, at times, taken seemingly inconsistent positions with respect to matters of prime importance. What occurred at the last hearing is an apt illustration: Although the petition of the debtor praying for reorganization was approved, counsel for the intervenor, who was also counsel for the debtor, contemplated filing a petition to dismiss the petition for reorganization and stated: " * * * that is the petition which I said might ensue this morning, and which will be filed by me before I leave on behalf of the stockholders—namely, to dismiss the petition—namely, to dismiss the proceedings." This motion, however, was not then nor has it since been filed. Although

it is not for this Court to decide, however it can be stated that in view of what has occurred since the petition for reorganization was approved, this Court is in some doubt as to whether the primary purpose of the sponsors of the petition was for reorganization of the debtor or for control of its property. This, of course, is a matter for the trustees to investigate and consider in determining whether a plan of reorganization is even possible or feasible.

This Court called a conference in chambers on March 20th in an effort to reconcile the differences existing between the parties, and, in any event, to put them on notice as to how the Court and the trustees intended to proceed once the petition for reorganization was approved.

The interested parties were informed that the petition for reorganization would be approved; that Franklin G. Hinckley, an attorney of Portland, Maine, and Cornelius J. Russell, a businessman of Bangor, Maine, would be appointed trustees; that in order to eliminate destructive competition, primarily for the purpose of protecting the principal asset of the debtor, all of the tracks were to be controlled by the trustees, or, in other words, "put in one basket"; and, that actual operation of the tracks by the trustees would not be tolerated.

It was stressed that the immediate problem facing the Court and the trustees was to preserve the value of Scarborough Downs; that to accomplish this, something by way of a temporary arrangement had to be effected quickly; that whoever operated the track would have to undertake all expenses, including a substantial amount as rental, which amount would be available for administrative expenses incurred by the trustees; and, that the amount necessary to operate the tracks would be very substantial.

Various possibilities were explored as to how the tracks could be operated. One possibility, suggested by the Special Master, was for the trustees to execute a lease of the entire property of the debtor. Counsel for Scarborough Downs, Inc., indicated it might be interested in leasing the property, but counsel for the debtor remarked that he would strenuously object to Scarborough Downs, Inc., becoming the lessee. His reasons, he stated, would be found in the transcript of the hearing before the Special Master. However, counsel for the debtor did remark that he had no objection to the mortgagee, Scarborough Holding Company, Inc., as lessee.

The Court, feeling that some progress had been made, suggested that the parties make a real and earnest effort to get together and prepare a single order to be presented on March 31, 1952, which would be a final disposition of how and by whom the tracks would be operated this year. If it were impossible for the parties to get together, then each side was to present a form of order. In any event, the Court stated it would act promptly on that day and determine the disposition of the tracks so that some group would be in a position to begin immediately to arrange for the opening of Scarborough Downs. Moreover, in order to expedite matters, the Court informed the prospective trustees that they should be prepared to consider any proposal presented to them before March 31, 1952.

Notwithstanding this conference, the intervenors object to the lack of adequate or proper notice with respect to (1) the order of April 1, 1952, approving the petition for reorganization and authorizing the trustees to take possession of the debtor's property, which order further provided that the trustees were authorized to execute leases thereof; and (2) the lease of the debtor's property, executed on April 1, 1952.

The power of the Court to authorize the trustees to lease all of the property of the debtor stems from section 116, sub. 3 of the Bankruptcy Act, 11 U.S.C.A. § 516, sub. 3, which reads as follows:

"Upon the approval of a petition, the judge may, in addition to the jurisdiction, powers, and duties in this chapter conferred and imposed upon him and the court— * * * (3) authorize a receiver or a trustee or a debtor in possession, upon such notice as the judge may prescribe and upon

cause shown, to lease or sell any property of the debtor, whether real or personal, upon such terms and conditions as the judge may approve".

The parties have not contended that the lease was authorized other than "upon cause shown". In fact, all parties agreed that some temporary arrangement had to be effected immediately in order to preserve the value of Scarborough Downs. The dispute on this point concerns only notice of the authorization to lease.

 Chapter X contemplates rehabilitation, and leases or sales of some of the debtor's property may be beneficial or an aid to the ultimate objective of the reorganization proceeding. To accomplish this, some play must be allowed for the joints of the machine. Such play is allowed by section 116, sub. 3, whereby an authorization by the judge must be made "upon such notice as the judge may prescribe". Notice is not mandatory [1] and conceivably, the judge under section 116, sub. 3 may order a lease or sale without notice, if under the circumstances an immediate lease or sale is necessary. See Collier on Bankruptcy, 14th Edition, Par. 3.27, at page 731. Even in ordinary bankruptcy, where property is perishable and delay in sale would be harmful, notice may be dispensed with. Section 58, sub. a(4) of the Bankruptcy Act, 11 U.S.C.A. § 94. In re Hawkins, D.C.N.Y., 125 F. 633, 11 Am. Bankr.Rep. 49. A lease or sale without notice, however, should be ordered only in the unusual case.

 In the opinion of this Court this is an unusual case and immediate action was mandatory. It appeared that any further delay would have made it impossible to operate Scarborough Downs during the 1952 season, which undoubtedly would have precluded the formulation of any feasible plan of reorganization. This question, however, is academic because the parties were not without notice of the action taken

by the trustees and approved of by this Court.

At the conference of March 20th, twelve days before the execution of the lease, all parties, including counsel for the debtor, emphasized that March 20th was just about the dead line for arranging for the opening of Scarborough Downs. Since time was of the essence, the Court notified those at the conference that the trustees would act promptly on March 31st in determining the disposition of the tracks, or, in other words, what group was to be in a position, on that day, to begin immediately arranging for this year's operation. If no agreement was reached between the parties, the Court would approve an order, which in its sound judgment would best benefit the debtor. Beyond this, all parties knew of the possibility of a lease as a temporary arrangement, and knew the Court had informed the prospective trustees to be prepared to consider any proposal or arrangement presented to them between March 20th and 31st.

No one objected to this procedure at the time. To the contrary, all interested parties as herein stated, stressed that immediate action was essential and the Court merely did that which all parties desired and requested, all for the benefit of the debtor. The parties had full knowledge that March 31st was the final Judgment Day as far as effecting a temporary arrangement was concerned. Of this they cannot now complain.

The attorneys for Scarborough Downs, Inc., aware of what had transpired in the conference of March 20th, and that a prompt decision would be made by this Court on March 31st, had prepared a proposed lease in accordance with the order they were to present for the Court's consideration. Three or four days prior to March 31st, they presented their proposed lease to Mr. Hinckley. He informed them that their action was premature and no discussion was had of its provisions. How-

---

1. It is clear that the provisions in ordinary bankruptcy requiring notice of all *sales* of the Debtor's property are inapplicable under Chapter X—section 58 sub. a(4) as inconsistent and in conflict therewith, unless and until bankruptcy liquidation is ordered; and, General Order 18 is made inapplicable to Chapter X proceedings, by virtue of General Order 52(2).

ever, the lease was studied by the trustees and found to be unsatisfactory. Shortly after the trustees were authorized to lease the debtor's property, negotiations were initiated by Scarborough Downs, Inc., and a lease was entered into with certain modifications to the satisfaction of the trustees. The lease was approved by the Court on the afternoon of the same day.

The lease, in the judgment of the trustees, was entirely advantageous to the debtor. In response to a question by counsel for the intervenor as to why more time was not spent by the trustees in making a thorough examination before entering into a lease, Mr. Hinckley testified, "I was aware that a lapse of time would do more harm than it would good. If we lost the 1952 racing season and the dates, we would have hurt the Debtor's property."

This statement was based on what transpired at the March 20th conference. Mr. Hinckley testified that he " * * * got the distinct impression from all counsel that we had just about reached the last moment then and something should be done. On March 31st and April 1st, nearly two weeks later, the situation seemed much more imperative."

The Court concludes, therefore, that the proceedings leading to the execution of the lease were proper in all respects.

The intervenors contend that the Court abused its discretion in approving the lease because the lessee is an improper party. They question the character of the principal owners of Scarborough Downs, Inc., their financial stability, and the sufficiency of the consideration for the lease, and assert that the lessee, as an alleged creditor of the debtor will be the primary beneficiary of the lease to the exclusion of the shareholders and other creditors.

After the lease had been entered into, the intervenors were given a full hearing and an opportunity to state their objections to the lease, and every opportunity to point out the alleged abuse of discretion on the part of the Court.

■ The action of the Court in approving the lease, executed by the trustees,

must stand unless an abuse of discretion clearly appears—that is, arbitrary action not justifiable in view of the situation and circumstances. See Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 95 F.2d 414. Discretion is abused when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. *If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.* Delno v. Market St. Ry. Co., 9 Cir., 124 F.2d 965. (Emphasis ours.)

The difficulties besetting the trustees have been previously stated and need not be repeated. They had a general and sufficient understanding of the situation.

■ In objecting to Scarborough Downs, Inc., the intervenors attack principally Mr. Robert Verrier, who was the general contractor for the building of the Scarborough plant, and who, to a considerable extent controlled the affairs of the debtor of which he was a stockholder, director, and treasurer, and who is also a part owner and an officer of Scarborough Downs, Inc. The objections to the other owners and officers of Scarborough Downs, Inc., namely, Mr. Thomas Mourkas and the Goldfines, is less pointed, as will appear later.

At the conference of March 20th, counsel for the debtor informed Mr. Hinckley that the transcript of the hearing before the Special Master would disclose the reasons for his objecting to Scarborough Downs, Inc., as lessee, and in particular to Mr. Verrier. This allegation was not sustained, and, as a matter of fact, counsel for the debtor stated at the hearing before the Special Master that this would come out later if investigated by the trustees. In any event, Mr. Hinckley testified that the allegation against Mr. Verrier was included in the opening remarks made by counsel for the debtor, and that a perusal of the record indicated nothing to him that would disqualify the lessee as a proper party, and the testimony of Mr. Verrier, brought out at this hearing, is

in substance the same as that before the Special Master.

It is difficult to ascertain on what ground the intervenors object to Mr. Thomas Mourkas, a stockholder of the debtor, an officer and director of Scarborough Downs, Inc., and a substantial businessman in Bangor, Maine—known to Mr. Russell for twenty-eight years as a man of the highest integrity. At least no evidence was introduced to establish whatever vague charges there were against this man. Paradoxically, the very questions of the counsel for the intervenor clearly established that Mr. Mourkas is one person in this proceeding who is above reproach. He continually sought cooperation of all parties in an attempt to save the track. His failure to obtain cooperation, as evidenced by the Cianchette-Bourisk sponsorship of legislation which resulted in banning night racing at Scarborough, was the main reason for his organizing Scarborough Downs, Inc. In his opinion, the night racing ban "killed the goose that laid the golden egg." Mr. Mourkas invested more good money, nevertheless, in an effort to keep a struggling, debt-ridden corporation from dying.

No objections were made at the trial to the Goldfines (Scarborough Holding Co., Inc.). Evidently, whatever objection had originally been made to them at the hearing before the Special Master was withdrawn, especially since counsel for the debtor and the intervenor had stated at the March 20th conference that there was no objection to the Goldfines (Scarborough Holding Co., Inc.), as lessee of the Scarborough plant.

Mr. Verrier, Mr. Mourkas, and the Goldfines all have substantial interests at stake. These people invested more money when none other was forthcoming in order to keep the track operating. Their operation in 1951 was very satisfactory to the Town of Scarborough and the public generally, of which Mr. Hinckley testified he was aware.

Besides finding reputable parties to operate the track, it was equally important to find those who were able to undertake the payment of taxes, insurance, and repairs, and the payment of pre-opening and operating expenses. The debtor had no money with which to operate. Based on last year's operation, the amount necessary would be around $150,000. The lessee assured the trustees that it was prepared to meet that financial responsibility. It also suggested that if there were any misgivings, on the part of the trustees, in regard to the faithful performance of its covenants in the lease, that it would be prepared to give a bond.

Considerable emphasis was laid by the intervenors on the alleged inadequacy of the consideration for the lease of the debtor's property. The consideration was $20,000, plus the payment of taxes, insurance, repairs and other expenses necessary to care for the property, and an additional $30,000 after a certain amount of profit has been realized. Certain modifications have been agreed to by the lessee, primarily for the protection of the first mortgagee, which would entail additional expense.

There are ample reasons for upholding the judgment of the trustees in this respect: (1) The trustees were primarily concerned with maintaining the going-concern value of Scarborough Downs through operation on a temporary basis by a reputable lessee who would undertake certain liabilities and the financial risks of operation; (2) the lessee paid a similar amount in 1951 to Scarborough Holding Company, Inc., and a like amount was agreed to for the current season; (3) although three other tracks were included in the lease to Scarborough Downs, Inc., little or no value can be attributed to them —Old Orchard Beach Kite Track, destroyed by a hurricane, is admittedly a liability—Gorham lost over $40,000 in 1951. This year it will have fewer dates, and it may not operate in competition with Scarborough Downs between June 28th and September 1st. There is also much doubt whether horses will be available. Lewiston presents a confusing picture. The testimony of Mr. Bourisk is inconsistent and little weight can be given it. (4) In any event, Scarborough Downs, Inc., ex-

pressed to the trustees that, since it considers these three tracks as liabilities, it would sub-lease to responsible parties for nominal consideration.

The intervenors also contend that the lessee is an improper party to a lease of the property of the debtor because, as an alleged creditor, it will be the principal beneficiary of the lease to the exclusion of all others.

It is claimed that Scarborough Downs, Inc., is a creditor of the debtor because of certain expenditures which were made prior to the opening of the 1951 racing season. About $20,000 was spent by Scarborough Downs, Inc., in replacing the roof of the club house which had been damaged by a hurricane, and $37,833.69 was paid for various items—namely, Horsemen's account—principally 1950 purses—$15,832.25; Horsemen's Benevolent Association, $3,394.25; Jockey's Guild, $1,606.80; Puett Gate Company, 1950 rental, $1,500—Triangle Publications, $390—American Totalizator, $5,999.96—Thomas Mourkas, assumption of concession advance, $5,500; and, interest, $560.

Briefly, Scarborough Downs, Inc., controverts the allegation by contending that the expenditures were made as a result of an agreement entered into between Scarborough Downs, Inc., and the mortgagee in possession; that unless those payments were made, the track could not operate; that the payments were voluntary; that no account receivable is carried on its books against the debtor, Maine State Raceways; and no demand has ever been made for any payment to Maine State Raceways.

The trustees, utilizing their best judgment under the existing circumstances, entered into the lease with Scarborough Downs, Inc., primarily for the purpose of benefiting the debtor. The Court, in approving the lease, also was of the opinion that such action was in the best interest of the debtor. Regardless of the relationship, unless it can be clearly and convincingly shown by the intervenors that the debtor and its creditors were to be damaged by the execution of the lease, the action of the trustees, approved by the Court, must stand. It is, therefore, immaterial to the issue to determine the relationship between the lessee and the debtor.

The basis of the trustee's judgment that the lease was primarily executed for the benefit of the debtor is that without operation of Scarborough Downs any attempt at reorganization would be futile. The problems that confronted the trustees in effecting a temporary arrangement of this nature for the operation of the track have been gone into before, and need not be repeated here.

There is little else that the trustees could have done under the circumstances. It has been stated previously that the trustees were limited as to parties with whom they could transact business. They were well aware of the activity of the intervenor, Mr. Joseph R. Cianchette, and Mr. John J. Bourisk, with respect to their sponsoring legislation banning night racing at the Scarborough plant. That legislation, which has been upheld by the Maine Supreme Judicial Court, has unquestionably done considerable damage to the principal asset of the debtor.

Considering the exigencies of the occasion and all of the surrounding factors that confronted the trustees and the Court, this Court is of the opinion that the trustees were justified in leasing the property of the debtor to Scarborough Downs, Inc.; that the Court was justified in approving the lease; that the parties had sufficient notice; and, that this Court did not abuse its discretion in any manner.

Hearing having been had as prayed for on the intervenors' petition, it is hereby ordered, adjudged, and decreed that the remaining prayers in said petition be, and they hereby are denied.